**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

**Civil Action No. 14-cv-02627-MSK-KLM**

**BOBBY LEE ADAMS,**

   **Plaintiff,**

**v.**

**DENVER HEALTH & HOSPITAL AUTHORITY, also known as Denver Health, of the City and County of Denver,**

   **Defendant.**

---

**OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on Defendant's, Denver Health & Hospital Authority (Denver Health), Motion for Summary Judgment **(#27)**, Plaintiff's, Bobby Lee Adams (Mr. Adams), Response **(#30)**, and Defendant's Reply **(#31)**. Also before the Court is Defendant's Unopposed Motion for Leave to Restrict **(#29)**.

### I.    Jurisdiction

This case presents claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq*. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.

### II.    Facts

The material undisputed facts (or, where disputed, the facts construed in the light most favorable to the non-movant) follow.

Mr. Adams was employed by Denver Health as a Certified Nurse Assistant and a Health Care Technician from 2009 through December of 2012. His duties included assisting charge nurses assigned to the medical/surgical department of the hospital.

Mr. Adams is a type II diabetic. During the period at issue he took insulin and needed regular eating breaks. Without regular eating breaks, his blood sugar dropped and he experienced shaking, weakness, and sweating, which lead to confusion and irritability.

Mr. Adams began his shift at Denver Health around 7:00 am and often did not get a break until 4:00 pm, a schedule that prevented him from eating on a regular basis thus causing him to feel ill. Mr. Adams told his immediate supervisor, nurse manager Kim Carroll, that he had diabetes and needed to take eating breaks to avoid hypoglycemic symptoms. Although Ms. Carroll told him she would take care of it, regular breaks remained a problem.

Denver Health employees receive annual performance evaluations from a supervisor. Such evaluations include input from coworkers (peer reviews). Peer review forms are sent to all coworkers, but there is no requirement that co-workers write reviews or complete all portions of a review form. The weight given to peer reviews in a performance evaluation is within the supervisor's discretion. Denver Health issues an Employee Principles & Practices policy, which reflects Denver Health's intent to afford an employee the opportunity to improve through corrective action and counseling. If satisfactory performance or behavior is not achieved and maintained after counseling or an improvement plan termination can result. This policy suggests that an employee whose performance evaluation is "unsuccessful" might be given instruction as to how to correct his performance.

Near the end of 2010, Mr. Adams received an "unsuccessful" annual evaluation prepared by charge nurse Jeanne King and Kim Carroll. The evaluation determined that Mr. Adams was hard-working and communicated well with patients, but that his interactions with fellow employees were poor. By way of example, it encouraged him to coordinate his breaks with coworkers, perform tasks when asked, and accept constructive criticism.

After his unsuccessful 2010 evaluation, pursuant to its policies, Denver Health issued Mr. Adams a verbal warning (memorialized in writing) and placed him on a Performance Improvement Plan ("PIP"). Mr. Adams was instructed that to avoid disciplinary action, including termination, he needed to make immediate improvements, as elaborated on in the PIP. Indeed, his PIP stated that failure to successfully complete its terms will result in termination. Mr. Adams's performance improved, and in June of 2011, he received a mid-year "successful" performance evaluation from Ms. Carroll. At the end of 2011, Mr. Adams's annual evaluation was again "successful," although it still suggested that Mr. Adams should continue to work on effective communication with coworkers.

Mr. Adams's employment continued without further incident until summer of 2012. Indeed, during this time he received awards for model employment, and was recognized for qualities such as displaying a positive attitude, fostering excellent patient relationships, and exceeding job duties when the hospital was short-staffed. But in June of 2012, Mr. Adams contracted Vancomycin-Resistant Enterococci (VRE), an infection that caused swelling, odor, and an open wound on his scrotum. Discussions with his doctors led Mr. Adams to believe that VRE was exacerbated by his diabetes. Mr. Adams was hospitalized, then took two to three weeks of authorized medical leave during June and July.

When Mr. Adams returned to work he was treated differently by his supervisor, Ms. Carroll. She seemed displeased at his absence and was abrasive, asking how long Mr. Adams thought the VRE might last or if it would reoccur. She made it clear that she would be unhappy if he needed more time off. For a few months, he experienced no further problems with the VRE.

On November 29, 2012, however, Mr. Adams experienced re-inflammation of the VRE. He reported to work but immediately went to the ER. When he returned from the ER, Mr.

Adams informed Ms. Carroll that he needed to take the rest of the day off due to pain. She responded with hostility; asking how many times this was going to continue. Because Mr. Adams had not called in "sick" at least four hours before his shift his absence was documented as "unexcused" pursuant to Denver Health's policy.

Shortly thereafter, Mr. Adams's 2012 evaluation was prepared by Ms. Carroll and charge nurse Abby Brockman. Five peer reviews were considered. Mr. Adams's two primary failings were in his interactions with his coworkers and his accountability. These failings correlated to peer reviews criticizing Mr. Adams's attitude, lack of cooperation and lack of accountability for work assigned. Mr. Adams general work ethic and productivity (at times), patient empathy, and knowledge remained strengths. However, overall Mr. Adams's annual evaluation was "unsuccessful."

Because this was Mr. Adams's second failing evaluation, Ms. Carroll asked human resources representatives whether Mr. Adams could be placed on a second PIP. The representatives informed her that Denver Health will not place an employee on a second PIP.[1] They instructed Ms. Carroll to meet with Mr. Adams to explain why he would be terminated prior to actually doing so.

On December 10, Ms. Carroll and Ms. Brockman met with Mr. Adams. They informed him of his unsuccessful evaluation and that Denver Health disallows multiple PIPs; thus, Mr.

---

[1] Both Ms. Stevens and Mr. Houchin submitted affidavits, reiterating that Denver Health will not place an employee on a second PIP. This is consistent with Denver Health's Employee Principles & Practices (**#30-20**), which states that "Termination is typically initiated for the occurrence of any infraction which occurs after a suspension or written warning."

Adams would be terminated. In a follow up meeting on December 18, 2012, Mr. Adams was terminated.[2]

Mr. Adams's Complaint (**#1**) states a single claim for discrimination under the ADA based terminating his employment and (impliedly) on failure to accommodate his need for medical leave.

### III.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Thus, the primary question presented to the Court in considering a Motion for Summary Judgment or a Motion for Partial Summary Judgment is: is a trial required?

A trial is required if there are material factual disputes to resolve. As a result, entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). A fact is material if, under the substantive law, it is an essential element of the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the conflicting evidence would enable a rational trier of fact to resolve the dispute for either party. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

The consideration of a summary judgment motion requires the Court to focus on the asserted claims and defenses, their legal elements, and which party has the burden of proof. Substantive law specifies the elements that must be proven for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty*

---

[2] Denver Health disputes that Mr. Adams was terminated, but for purposes of summary judgment the Court accepts Mr. Adams's statements as true. Regardless, Denver Health admits that it would have terminated Mr. Adams if it did not actually do so on December 18, 2012.

*Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). As to the evidence offered during summary judgment, the Court views it the light most favorable to the non-moving party, thereby favoring the right to trial. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

Motions for summary judgment generally arise in one of two contexts – when the movant has the burden of proof and when the non-movant has the burden of proof. Each context is handled differently. When the movant has the burden of proof, the movant must come forward with sufficient, competent evidence to establish each element of its claim or defense. *See* Fed. R. Civ. P. 56(c)(1)(A). Presumably, in the absence of contrary evidence, this showing would entitle the movant to judgment as a matter of law. However, if the responding party presents contrary evidence to establish a genuine dispute as to any material fact, a trial is required and the motion must be denied. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

A different circumstance arises when the movant does not have the burden of proof. In this circumstance, the movant contends that the non-movant lacks sufficient evidence to establish a *prima facie* case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party must identify why the respondent cannot make a *prima facie* showing; that is, why the evidence in the record shows that the respondent cannot establish a particular element. *See Collins*, 809 F.3d at 1137. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, then a trial is required. Conversely, if the respondent's evidence is inadequate to establish a *prima facie* claim or defense, then no factual determination of that claim or defense is required and summary may enter. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

**IV.     Analysis**

The ADA is intended to prevent employers from discriminating against otherwise qualified individuals due to the individual's disability. *See Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 858 (10th Cir. 2003); 42 U.S.C. § 12112(a). Claims brought under the ADA (whether for discrimination or failure to accommodate) are analyzed pursuant to the familiar *McDonnell-Douglas* burden-shifting framework. *See E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038-39 (10th Cir. 2011); *cf. McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case for a disability discrimination claim, a plaintiff must demonstrate that he (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held; and (3) suffered discrimination by an employer because of that disability. *Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1086 (10th Cir. 2008). Establishing a *prima facie* requires the employee to present some evidence as to each element. *See Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015); *see also Davidson v. Am. Online, Inc.* 337 F.3d 11790, 1189 (10th Cir. 2003). If the employee establishes a *prima facie* case the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *C.R. England*, 644 F.3d at 1138. If the employer proffers a facially-neutral reason, the burden returns to the employee to demonstrate pretext by showing that the employer's proffered explanation for its action is so inconsistent, incoherent, weak, or contradictory that no rational fact-finder could deem it worthy of belief. *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

      A.  Discrimination – Termination

Denver Health first contends that Mr. Adams cannot show a *prima facie* case for disability discrimination. Denver Health maintains that Mr. Adams 1) is not disabled as defined by the ADA, and 2) cannot show circumstances giving rise to an inference of discrimination.[3]

To show a qualifying disability, an employee must come forward with evidence that he has a recognized impairment that substantially limits one or more major life activity. *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007); 42 U.S.C. § 12102(2). A major life activity encompasses functions central to daily life, such as caring for oneself, performing manual tasks, walking, seeing, hearing, eating, sleeping, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working, as well as the operation of a major bodily function. 42 U.S.C. § 12102(2)(A), (B). Whether an employee's major life activity is substantially limited requires considering the employee's ability to perform the activity as compared to the general population. 29 C.F.R. § 1630.2(j)(1)(ii). An impairment need not prevent, or significantly or severely restrict the major life activity to be substantially limiting, it must only diminish the employee's ability as compared to most people. *Id.* A periodic impairment may suffice if, when active, it substantially limits a major life activity. 29 C.F.R. § 1630.2(j)(1)(vii). As pertinent here, diabetes may constitute a disability under the ADA if the symptoms and side effects substantially limit a major life function. *See Carter*, 662 F.3d at 1142; *cf. Wilkerson v. Shinseki*, 606 F.3d 1256, 1263 (10th Cir. 2010).

Mr. Adams generally contends that his diabetes and subsequent contraction of VRE adversely affected his ability to work. He states that he was unable to eat regularly, which decreased his ability to perform manual tasks and cognitive processing. When he contracted

---

[3] As to the second element of a *prima facie* case, Denver Health does not dispute that Mr. Adams has come forward with sufficient evidence to establish that he is qualified to perform the essential functions of his job with reasonable accommodation. *See Smith v. Blue Cross Blue Shield of Kan., Inc.*, 102 F.3d 1075, 1076 (10th Cir. 1996).

VRE his work was additionally affected due to pain.  It is not clear on this record that Mr. Adams suffered any side effects or episodes that impaired a major life activity and his ability to work.  But for purposes of its Order on this motion, the Court will assume, without deciding, that Mr. Adams is disabled within the meaning of the ADA.

Thus, the Court turns to whether Mr. Adams can demonstrate circumstances giving rise to an inference that his termination was based on discrimination.  *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011); *see also Young v. United Parcel Serv., Inc.*, 135 S.Ct. 1338, 1354 (2015).  To so, a plaintiff must present affirmative evidence, whether direct or circumstantial, that his disability was a determining factor in the employer's decision to impose adverse action.  *See Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167, 178-79 (2009); *see also Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001).  At the *prima facie* stage, an employee can create a genuine dispute of material fact by showing that his termination was temporal with the development or a complication of his disability.  *See Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007); *Burget v. Geary Securities, Inc.*, No. CIV 09-1015, 2010 WL 3749412, *5 (D. Okla. Sept. 21, 2010).

There is a clear temporal link between Mr. Adams's VRE related absence and his termination.  Mr. Adams missed work when he went to the emergency room on November 29, 2012.  He spoke with his reviewing supervisor about the VRE and she expressed her concern that it would result in future absences.  Two weeks later, Mr. Adams was summoned to a meeting during which he was informed by the same supervisor that he would not pass his 2012 performance evaluation.  A week later, on December 18, 2012 he was terminated.  At the *prima facie* stage, this temporal connection suffices.

Denver Health must offer a facially neutral reason for Mr. Adams's termination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *see also MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005) (at this stage, the employer's burden is simply to produce some facially neutral reason for the action taken). Denver Health states that Mr. Adams received a failing annual evaluation (after having already received an unsuccessful evaluation and a PIP two years before) because he continued to display performance problems, including inability to work as a team and related issues with coworkers.

According to Denver Health's Employee Principles & Practices, Denver Health will take corrective action such as counseling and plans for improvement, anytime an employee is not successful in meeting its practices, procedures, and protocols. Consistent with this policy, after Mr. Adams received a first unsuccessful evaluation in 2010, he was given this opportunity to improve when he was issued a PIP. However, Mr. Adams displayed the same problems and infractions that led to the first corrective action (the PIP) two years later. Denver Health's policy is that "[w]hen satisfactory performance/ behavior is not maintained after appropriate counseling, then progressive corrective action, up to and including termination, will result"; and, "[t]ermination is typically initiated for the occurrence of any infraction which occurs after a suspension or written warning." *See Docket* (**#30-20**) 1, 3. This was Mr. Adams's situation – he failed to maintain satisfactory behavior after prior corrective action, including a written warning and PIP. Though the written policy does not expressly disallow a second PIP, human resource representatives Ms. Stevens and Mr. Houchin both stated in affidavits that, as a matter of practice, Denver Health does not permit an employee to be placed on a second PIP after he has

failed a first.[4] This constitutes a legitimate, nondiscriminatory reason for terminating Mr. Adams.

The burden then returns to Mr. Adams to demonstrate Denver Health's explanation is pretext for discrimination. To show pretext, an employee must put forth sufficient evidence from which a reasonable fact-finder could conclude that his disability was the but-for cause of disparate treatment. *See Gross*, 557 U.S. at 178; *see also Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014); *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 748 (10th Cir. 1999); *Doe v. Bd. of Cnty. Comm'rs of Pay Cnty., Okla.*, 613 Fed. App'x 743, 747 (10th Cir. June 4, 2015). Put another way, Mr. Adams must show that his termination was motivated by his disability. He may do so with evidence that the employer's nondiscriminatory reason is so weak, implausible, inconsistent, or incoherent that no reasonable fact-finder could deem it worthy of belief. *See Univ. of Tex. SW Med. Center v. Nassar*, 133 S.Ct. 2517, 2531, 2533 (2013); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003); *C.R. England*, 644 F.3d at 1052. For example, an employee might show that the employer's nondiscriminatory reason equally applied to other similarly situated employees who were treated differently. *See Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 539 (10th Cir. 2014). Or, an employee might identify derogatory and discriminatory comments made by a supervisor or co-worker that can be linked to the employee's termination. *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994). In the case of termination, pretext may be demonstrated by procedural irregularities surrounding the decision, such as the employer's failure to fully investigate or consider the circumstances before

---

[4] The Employee Principles & Practices also makes clear that it "in no way limits the reasons for termination of employment or the 'at will' relationship between each employee and Denver Health." *See Docket* (**#30-20**), 1.

11

terminating the employee. *See id.*; *see also Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002).

Mr. Adams first contends that there were procedural irregularities surrounding his termination. He argues that Denver Health did not abide by its employee Counseling and Corrective Action Principles and Practices that grants employees a chance to correct any performance deficiencies following a failed evaluation. The policy generally states that Denver Health will take corrective action to assist an employee in improving his behavior, but it does not obligate Denver Health to do so. For example, it provides that termination is typically initiated for an infraction that occurs after a suspension or written warning.[5] Mr. Adams does not contest that he was initially given a chance to improve when he was issued a warning and a PIP in 2010. These were opportunities for Mr. Adams to improve his performance. Mr. Adams changed his behavior enough to receive a passing evaluation in 2011, but again in 2012, the problems giving rise to his 2010 PIP resurfaced in his 2012 evaluation. Denver Health's termination of his employment under these circumstances was consistent with its formal policy as articulated in its Employee Principles & Practices, and was consistent with its informal practice of not issuing employees multiple PIPs.[6]

Mr. Adams alternatively argues that the underlying motivation for his termination was discriminatory not performance-based. As evidence that his performance was not the true concern, Mr. Adams introduced favorable written commendations issued by supervisors for great work and patient care. These awards, however, are not inconsistent with Denver Health's reasons for terminating Mr. Adams. For the most part, the awards recognized Mr. Adams's

---

[5] Indeed, the policy expressly states that termination may even be the first (and only) step of the process for more serious violations.

[6] Indeed, Mr. Adams is not able to identify, and Mr. Houchin and Ms. Stevens state that they are aware of none, any employee issued more than one PIP.

abilities to interact with, care for, and keep patients safe, skills that were never criticized in his 2012 review nor offered as reason for his termination. True, one award praises Mr. Adams's "team support," which would appear inconsistent with his 2012 evaluation. However, there is no detail regarding what the award was commending. Mr. Adams's substandard performance that resulted in the second unfavorable review grew from his failure to get along with co-workers, accept responsibility for work assigned, and assist wherever needed. This constellation is more specific, frequent, and comprehensive than a lone award's reference to good "team support."

Lastly, Mr. Adams argues that his second unsuccessful evaluation was not fair or impartial (and thus suspect) because 1) Denver Health allowed supervisors unfettered discretion with regard to the weight given to coworker reviews, and 2) the coworkers who reviewed Mr. Adams were biased against him. As to his first contention, the Court's role is not to express a view on the propriety of the discretion Denver Health gives its supervisors when evaluating employees. Mr. Adams was reviewed in the manner authorized by Denver Health's policy and there is no showing that he was reviewed differently from other employees. Thus, there is no evidence of an irregularity.[7]

Mr. Adams's second contention is that his peer reviews were untrustworthy and should not have been considered because his coworkers were biased against him. Assuming the peer reviews were biased, there is no evidence to suggest that the supervisors who prepared Mr. Adams's review knew this to be the case.[8] (And the Court must examine the facts as they

---

[7] The Denver Health "Annual Non-Managerial Performance Appraisal – Evaluator's Guidelines"(**#30-19**) corroborates the consideration of "team review" in an employee's evaluation.

[8] Mr. Adams does not expressly argue that his supervisors displayed any particular discriminatory animus, nevertheless, the Court reviews the record as to that. The record contains two incidents worth noting: 1) Ms. Carroll was hostile towards Mr. Adams after he needed time

existed to the decision-makers).[9] Moreover, nothing in the reviews themselves reflects any discriminatory animus related to Mr. Adams's disability.

The Court therefore finds that Mr. Adams has not come forward with sufficient evidence that Denver Health's nondiscriminatory explanation for Mr. Adams's termination was a pretext for disability discrimination. Summary judgment is in favor of Denver Health on Mr. Adams's ADA claim for termination is therefore granted.

### B. Failure to Accommodate

Although not articulated as a separate claim, the pleadings suggest that Mr. Adams also seeks relief for Denver Health's failure to accommodate his diabetes by refusing to authorize medical leave to treat his VRE.[10]

---

off to treat VRE and 2) Ms. Brockman made demeaning or condescending comments to Mr. Adams (unrelated to his diabetes). Neither incident is sufficient to show an illegal discriminatory motive. Anti-discrimination in employment laws are not meant to be "general civility codes" for the workplace; offhand comments do not amount to discrimination. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

[9] Mr. Adams also does not expressly advance what is known as the "cat's paw" theory in employment jurisprudence. Under this theory an employer who acts without discriminatory intent can be held liable for a subordinate's discriminatory animus if the employer uncritically relies on the subordinate's reports or recommendations in deciding to take adverse employment action against a plaintiff. *See Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015); *E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484-85 (10th Cir. 2006). Here, although Mr. Adams generally labels the 2012 peer reviews as biased, he does not demonstrate that the reviews were biased because of, or displayed any animus surrounding, his disability – diabetes. Rather, the concerns shared by his peers are that he "dislikes communicating with some people"; is "difficult to interact with"; "has a negative attitude" and "brings a sense of negativity to the floor which permeates through the staff"; "rarely accepts responsibility" and "just states it's someone else's fault"; is "rude . . . unapproachable and defensive"; and is a "very poor communicator and appears hostile in most situations that call for teamwork."

[10] In his Response to the Motion for Summary Judgment, Mr. Adams raises a new contention that Denver Health's refusal to provide him with needed breaks to eat and monitor his blood sugar forms the basis for a failure to accommodate claim. This Court will generally not consider claims raised for the first time in a Response brief. *See Fuqua v. Lindsey Mgmt. Co.,*

To establish a *prima facie* case for failure to accommodate, an employee must show that: (1) he is disabled; (2) his employer had notice of his disability; and (3) with reasonable accommodations, he could perform the essential functions of his job, but his employer failed to make such accommodations. *See Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1252 (10th Cir. 2004); *see also Spielman v. Blue Cross & Blue Shield of Kan. Inc.*, 33 Fed. App'x 439, 443 (10th Cir. April 9, 2002). As noted above, the Court assumes that Mr. Adams is disabled. It further assumes that Ms. Carroll and Denver Health knew of his disability. Thus, the Court begins its analysis with whether Denver Health failed to afford him a reasonable accommodation.

This question begins with another. Did Mr. Adams propose or request a reasonable accommodation? *Osborne*, 798 F.3d at 1267. A reasonable accommodation is one that allows the employee to perform the essential functions of his job without modifying or eliminating the job's essential functions. *Id.*; *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1264 (10th Cir. 2009). Reasonable accommodations include, for instance, part-time or adjusted work schedules, modification of equipment or devices, or additional or alternative training. *Hennagir*, 587 F.3d at 1264. Mr. Adams bears the burden to a proposed reasonable accommodation existed. *See Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 744 (10th Cir. 2013).

The proposed reasonable accommodation here appears to be medical leave. An allowance of leave for an employee to receive medical care or treatment may be a reasonable

---

*Inc.*, 321 Fed. App'x 732, 734-35 (10th Cir. March 31, 2009) (*citing Lawmaster v. Ward*, 125 F.3d 1341, 1346 at n.2 (10th Cir. 1994). Regardless, because this case involves claims for employment discrimination, Mr. Adams was required to exhaust his administrative remedies by asserting with sufficient detail each claim for relief in an EEOC charge. *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007); *Shikles v. Sprint/ United Mgmt. Co.*, 426 F.3d 1304, 1308-09 (10th Cir. 2005). He did not exhaust such a claim by raising it first with the EEOC, thus the Court lacks jurisdiction to determine it.

accommodation. *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999). But the problem for Mr. Adams is that there is no evidence that he requested and was denied leave or that his ability to request leave was foreclosed by Denver Health.[11] *See Koessel*, 717 F.3d at 744; *see also Boykin v. ATC/VanCom of Colo., L.P.*, 247 F.3d 1061, 1065 (10th Cir. 2001). To the contrary, Mr. Adams testified that there never a time where he requested leave but that his request was denied, thus, there can be no failure to provide leave. Thus, Mr. Adams has not made a *prima facie* showing sufficient to support a failure to accommodate claim, and summary judgment in favor of Denver Health and against Mr. Adams is appropriate.

### IV. Motion to Restrict

Also before the Court is Denver Health's Unopposed Motion for Leave to Restrict (**#29**). Denver Health requests permission for a Level 1 restriction of public access for Docket #**27-14**, Exhibit N (filed at **#28**) to their Motion for Summary Judgment. Exhibit N is a redacted list of Denver Health employees who have requested and taken family or medical leave.

The Court begins its review of a motion to restrict with the acknowledgment that there is a well-established common-law right of access to judicial records. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). This right is premised upon the idea that the public must retain the ability to evaluate a court's decision-making and ensure that it is promoting justice by acting as a neutral arbitrator. *See United States v. McVeigh*, 119 F.3d 806, 814 (10th Cir. 1997). Access to court filings may, however, be restricted when the public's right of access is outweighed by interests favoring non-disclosure. *See id.* at 811. Because Exhibit N was not

---

[11] Without more, Mr. Adams's conclusory argument that he was afraid to ask for additional leave is not sufficient. The record reflects that when Mr. Adams needed medical leave, it was granted, leaving nothing from which the Court might infer that Mr. Adams was legitimately foreclosed from asking for leave.

considered by the Court in making its determination on this motion, the public has no interest in the information provided in that document.

Accordingly, the Motion for Leave to restrict is properly granted.

### V. Conclusion

The Court hereby **GRANTS** Defendant's Motion for Summary Judgment (**#27**). The Clerk shall enter judgment in favor of the Defendant on all of Plaintiff's claims and close this case. The Court also **GRANTS** the Motion for Leave to Restrict (**#29**). The provisional restriction on Docket #**28** will remain in place permanently.

DATED this 30th day of March, 2016.

**BY THE COURT:**

_Marcia S. Krieger_

Marcia S. Krieger
United States District Court